TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00713-CV






Flare Ten-Booms, Appellant


v.


Deborah L. Obregon, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. D-1-GN-09-001198, HONORABLE PAUL R. DAVIS JR., JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Appellant Flare Ten-Booms appeals from a summary-judgment order and final
judgment issued in favor of appellee Deborah L. Obregon. In the underlying suit, Ten-Booms
alleged that Obregon breached a "property sale contract" that called for Obregon to sell Ten-Booms
a portion of a plot of land that she owned in exchange for a $10,000 down payment and a purchase
price of $100,000. Ten-Booms raised a multitude of claims and sought several remedies, including
specific performance. Obregon filed counterclaims for declaratory judgment and unpaid rent and
also sought attorney's fees. Obregon also raised several affirmative defenses. 

 Later, Obregon filed a motion for summary judgment, claiming among other things
that, to the extent that Ten-Booms sought to enforce the agreement between the parties as a contract
for the sale of real property, the agreement was invalid, and seeking summary judgment on her
affirmative defenses and counterclaims. The trial court granted Obregon's summary-judgment
motion. The trial court then held a hearing on Obregon's request for attorney's fees and issued a
final judgment ordering Ten-Booms to pay the requested attorney's fees and six weeks of
unpaid rent. 

 On appeal, Ten-Booms raises four issues relating to the summary-judgment order,
contending that the trial court erred in granting summary judgment because (1) the agreement was
valid and enforceable; (2) there was an issue of material fact as to the boundary line of the property
that was the subject of the agreement; (3) Obregon breached the agreement and rendered Ten-Booms's contractual performance impossible; and (4) Obregon's conversion of the property to a
condominium regime was invalid. Ten-Booms also raises two issues relating to the final judgment,
asserting that the trial court erred in (1) concluding that he breached his lease and ordering him to
pay rent from after the breach, and (2) ordering him to pay Obregon's attorney's fees. 

 Because Ten-Booms fails to challenge every ground for summary judgment advanced
in the trial court, and because we conclude that the trial court did not err in determining that Obregon
was entitled to summary judgment on one of the unchallenged grounds, we affirm the trial court's
order granting summary judgment in favor of Obregon. Because we conclude that the trial court did
not err in awarding Obregon unpaid rent in the amount of $1,484.17 or attorney's fees in the amount
of $69,578.81, we affirm the trial court's final judgment. 


BACKGROUND

 In 1997, Flare Ten-Booms began renting a small house in Austin for the operation
of a hair salon. The house was on a single rectangular lot ("the Lot") that faced Lamar on one side
and Evergreen on the other side. Each end of the Lot contained a small house used for commercial
purposes, and there was a small parking area between the two houses. Flare Ten-Booms rented the
house on the Evergreen side of the Lot at 1704 Evergreen ("the Evergreen property"). In 2000,
Deborah Obregon began renting the house on the other side, at 1703 South Lamar ("the Lamar
property"), for the operation of a tattoo business. Ten-Booms and Obregon each had exclusive use
of their respective houses, and they shared the use of the parking area. 

 During their tenancies, Ten-Booms and Obregon discussed the possibility of buying
their respective leaseholds if the Lot ever became available. In 2005, Obregon learned that the Lot
was on the market. Obregon contacted the property manager to discuss the possibility of buying the
Lot. Obregon also spoke with Ten-Booms about whether he was interested in buying part of the Lot. 
At the time, Ten-Booms was in the process of filing for bankruptcy and was not in a position to
obtain financing for his portion of the Lot. Obregon testified at her deposition that she and Ten-Booms planned for her to obtain financing, buy the Lot, and then wait for Ten-Booms to recover
financially after his bankruptcy, when he could potentially obtain financing and buy his portion of
the Lot. Obregon testified that she and Ten-Booms orally agreed that Ten-Booms's portion of the
Lot would be $100,000, while her portion of the Lot would be $175,000. She testified that her
portion of the Lot fronted South Lamar and was the larger portion of the Lot, thus making it more
expensive than his portion. Ten-Booms testified in his deposition that he and Obregon orally agreed
that they would divide the Lot evenly, making fifty percent of the Lot his portion and the other fifty
percent her portion. 

 Obregon ultimately obtained two loans, one from a private lender and one from her
parents, and bought the Lot for $275,000. Near the same time, Obregon prepared a lease-purchase
agreement ("the Agreement") that set forth the parties' agreement regarding the Lot. Both parties
signed the Agreement, which is titled "Lease Purchase Agreement" and states:


 This agreement is between Deborah Obregon (Lessor) and Flare Ten Booms (Lessee)
for the lease purchase of 1704 Evergreen, Aus., Tx. 78704. The terms are as follows:
The purchase price shall be $100,000.00, with $10,000.00 dollars [sic] down. The
payments shall be $697.77 per month plus the cost of property tax and insurance,
bringing the payment to $989.44 per month. This agreement shall be in effect for 36
months, after which time Mr. Ten Booms shall seek his own financing for the
remaining balance of $83,101.31. In the event Mr. Ten Booms is unable to secure
financing in a timely fashion he shall have the right to continue this agreement at
whatever terms Mrs. Obregon is able to secure financing at. In the event of Mr. Ten
Booms [sic] demise during the term of this lease the property shall revert back to
Mrs. Obregon, with Mrs. Obregon paying the estate of Mr. Ten Booms the sum of
$4,432.50. 


 In the case of Mrs. Obregons [sic] demise this agreement shall legal[ly] bind her heirs
or assigns to the term contained therein.


 During the effect of this agreement Mrs. Obregon and Mr. Ten Booms shall jointly
share the cost of upkeep on the common areas, i.e. the parking lot and grounds
keeping. They shall each bear all expense and upkeep of their individual buildings. 
 


 Near the time that Obregon closed on her purchase of the Lot, Ten-Booms paid her
$4,000 in cash. Ten-Booms testified at his deposition that the $4,000 was earnest money for his
portion of the Lot. A receipt made by Obregon for Ten-Booms at his request states that Obregon
received $4,000 from Ten-Booms as earnest money for the purchase of "1703 So. Lamar/Evergreen"
and that the money was "to be refunded if financing is not obtained." At another point in his
deposition, Ten-Booms testified that at the time he gave Obregon the $4,000, he did not think of the
money as a loan, gift, or part of a down payment. In later corrections to his deposition testimony,
Ten-Booms stated that he considered the $4,000 to be part of his $10,000 down payment. Obregon
testified that she used the $4,000 toward closing costs associated with her purchase of the Lot.

 After making the $4,000 payment, Ten-Booms made occasional further payments to
Obregon. Ten-Booms paid Obregon a total of $9,825 toward his $10,000 down payment. Obregon
testified at her deposition that Ten-Booms contacted her at some point and indicated that he wanted
her to buy his option back. She made him an offer, which he rejected. Then, in 2007, Ten-Booms
contacted a lender to try to obtain financing for his purchase of the Evergreen property. Ten-Booms
testified that the lender denied him financing because the Agreement did not contain a specific legal
description of the Evergreen property, nor was there other documentation showing the boundaries
of the Evergreen property. Ten-Booms consulted an attorney, who told him that the Lot could not
be legally subdivided. 

 Obregon learned of a person named Rick Vaughn who specialized in subdividing
property. Obregon made an appointment to meet with Vaughn, and Obregon and Ten-Booms went
to the meeting together. During the meeting, Vaughn told Obregon and Ten-Booms that city
regulations prohibited the division of a piece of property as small as the Lot. Vaughn explained that
Obregon would have to apply with the city for a variance but that it was doubtful that she would be
successful. He also explained that it would cost at least $10,000 for her to go through the process
of applying for a variance. Obregon testified in her deposition that she was shocked when she
learned that it would be so difficult to divide the Lot. Vaughn informed Obregon and Ten-Booms
that an alternative solution would be to convert their respective portions of the Lot into
condominiums, which would allow Obregon to sell Ten-Booms the Evergreen property as a
condominium. Vaughn referred Obregon and Ten-Booms to several attorneys who could help them
with a conversion. 

 Obregon began calling attorneys and attempting to make appointments to meet with
them. She testified that she wanted Ten-Booms to go with her to an appointment but that he would
no longer answer or return her phone calls. Eventually, she received a letter from an attorney stating
that the attorney represented Ten-Booms and that the attorney wanted to continue negotiations
regarding the Evergreen property on Ten-Booms's behalf. The attorney stated that Ten-Booms
wanted Obregon to buy the Evergreen property at a fair market rate but was also willing to explore
other feasible options. The letter also served as a formal rejection of Obregon's previous offer to
buy Ten-Booms's option for $35,000. The parties continued communicating through their attorneys. 

 Several months after Obregon received the initial letter from Ten-Booms's attorney,
Obregon filed for and obtained a conversion of the Lot into two condominium units, making the
Lamar property "Unit One" and the Evergreen property "Unit Two." Under the condominium
regime, the Lamar property is 5,439 square feet, and the Evergreen property is 3,941 square feet. 
After the conversion of the Lot, Obregon continued offering to sell the Evergreen property to Ten-Booms as a condominium unit, but he declined to buy it in that form. The parties eventually went
to mediation, which resulted in the following mediated settlement agreement:


 1. The present dispute will be abated until December 31, 2008. 

 

 2. Deborah Obregon will list [the Evergreen Property] for sale at the price of at least
$150,000.00.


 3. During the abatement period, Flare Ten-Booms will continue to pay monthly rent
in the amount of $989.45 by the 15th of each month.


 4. At the end of the abatement period, if Obregon has not closed on a sale of [the
Evergreen property] for the price of $150,000.00 or more, then the parties will return
to the exact same positions they were in before this agreement except that the
deadline for Ten-Booms to pay "the remaining balance of $83,101.31" under the
document entitled "Lease Purchase Agreement" shall be January 30, 2009. 


 5. This agreement is without prejudice to any party's opportunity to contest the
validity or enforceability of the "Lease Purchase Agreement." 


 6. If Obregon succeeds in selling [the Evergreen property] for $150,000.00 or more
before the end of the abatement period, then Ten-Booms shall receive $45,000.00 of
the sale proceeds and the parties shall have no further obligations to each other.


 7. During the abatement period, Ten-Booms will cooperate as reasonably necessary
for Obregon and her agents to market the property, including providing access to [the
Evergreen property], keeping [the Evergreen property] in reasonably clean and
presentable condition, and will provide a key to Obregon to allow her reasonable
access. 

 


 Obregon did not sell the Evergreen property by the end of the abatement period. Ten-Booms did not pay the remaining balance of $83,101.31 by January 30, 2009. Obregon sent Ten-Booms a notice of her intent not to renew or extend his lease past March 31, 2009 and asking him
to vacate the Evergreen property by that date. Ten-Booms did not pay his February 2009 rent and
left the Evergreen property by the end of that February. He filed suit against Obregon in April 2009. 
Obregon filed a motion for summary judgment on both traditional and no-evidence grounds, and the
trial court granted the motion. After summary judgment was granted, Obregon filed a supplement
to the record setting forth the attorney's fees she had incurred in the lawsuit. After a hearing
addressing the issue of Obregon's attorney's fees, the trial court issued a final judgment in which it
ordered that Ten-Booms pay Obregon $69,578.81 in attorney's fees and $1,484.17 in back rent. This
appeal followed. 

DISCUSSION

 Ten-Booms challenges the trial court's order granting summary judgment in favor
of Obregon and the trial court's final judgment ordering Ten-Booms to pay Obregon attorney's fees
and six weeks of back rent. We address the summary-judgment order and final judgment
separately below. 


Summary-Judgment Order

 We review summary judgments de novo. Valence Operating Co. v. Dorsett,
164 S.W.3d 656, 661 (Tex. 2005). We take as true all evidence favorable to the nonmovant, and
we indulge every reasonable inference and resolve any doubts in the non-movant's favor. Id. 
 

 A "traditional" motion for summary judgment is properly granted when the movant
establishes that there are no genuine issues of material fact and that he or she is entitled to
judgment as a matter of law. Tex. R. Civ. P. 166a(c); Lear Siegler, Inc. v. Perez, 819 S.W.2d
470, 471 (Tex. 1991); Holmstrom v. Lee, 26 S.W.3d 526, 530 (Tex. App.--Austin 2000, no
pet.). A defendant seeking summary judgment must negate as a matter of law at least one element
of each of the plaintiff's theories of recovery or prove as a matter of law each element of an
affirmative defense. Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995);
Holmstrom, 26 S.W.3d at 530. 

 A party seeking a "no-evidence" summary judgment must assert that there is no
evidence of one or more essential elements of the claims on which the non-movant will have the
burden of proof at trial. Tex. R. Civ. P. 166a(i); Holmstrom, 26 S.W.3d at 530. If the
nonmovant fails to produce more than a scintilla of probative evidence raising a genuine issue of
material fact as to each challenged element on which he has the burden of proof, summary
judgment is proper. Holmstrom, 26 S.W.3d at 530. More than a scintilla of evidence exists if
the evidence would allow reasonable and fair-minded people to differ in their conclusions. 
Forbes, Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 172 (Tex. 2003).

 In Ten-Booms's petition, he raised several claims, including claims for promissory
estoppel, real-estate fraud, breach of contract, impossibility of performance, mutual mistake, and
declaratory judgment. As relief, he sought reformation of the contract, specific performance, a
constructive trust, a partition order, damages, and injunctive relief. Obregon filed counterclaims
for declaratory judgment and back rent. She also raised several affirmative defenses, including no
meeting of the minds, impossibility, mutual mistake, insufficient legal description, novation,
expiration of the option, termination of the contract, abandonment of the tenancy, failure of
consideration, and judicial estoppel. In Obregon's motion for summary judgment, she moved for
traditional and no-evidence summary judgment on each of Ten-Booms's claims and requests for
relief, as well as traditional summary judgment on her counterclaims and affirmative defenses.

 The trial court granted Obregon's summary-judgment motion without specifying
the grounds on which it did so. On appeal, Ten-Booms challenges only some of the issues raised
in Obregon's summary-judgment motion. Based on our review of Obregon's summary-judgment
motion and Ten-Booms's response to that motion, we conclude that at the least, the trial court could
have granted summary judgment on Obregon's affirmative defense of failure of consideration, which
is unchallenged on appeal. (1) 

 Failure of consideration occurs when, due to a supervening cause after an agreement
is reached, the promised performance fails. (2) See City of The Colony v. North Tex. Mun. Water Dist.,
272 S.W.3d 699, 733 (Tex. App.--Fort Worth 2008, pet. dism'd); U.S. Bank, N.A. v. Prestige Ford
Garland Ltd. P'ship, 170 S.W.3d 272, 279 (Tex. App.--Dallas 2005, no pet.). In other words,
failure of consideration occurs because of subsequent events. See The Colony, 272 S.W.3d at 733. 
For example, one party's failure to perform its obligations under the agreement may result in the
other party's failure to receive the consideration set forth in the agreement. See id.; U.S. Bank,
170 S.W.3d at 279. To establish the affirmative defense of failure of consideration, the defendant
must offer summary-judgment proof establishing: (1) the consideration for the property at the
inception of the agreement; and (2) that the consideration later failed. See, e.g., National Bank of
Commerce v. Williams, 84 S.W.2d 691, 692 (Tex. 1935). 

 Here, in Obregon's motion for summary judgment, she asserted that she could
establish a failure of consideration because the Agreement required Ten-Booms to pay two sums of
money as consideration--the down payment of $10,000 and the balance of the purchase price, which
was $83,101.31--and Ten-Booms failed to perform either of the two requirements. In support of
her argument, Obregon pointed to the Agreement, which set forth the two-part consideration required
to purchase the Evergreen property, and evidence in the record establishing that Ten-Booms did not
pay the two amounts. Specifically, regarding Ten-Booms's failure to pay the down payment,
Obregon cited the following testimony from Ten-Booms's deposition:



 Defense: Your accounting . . . is that you had paid 9,825 dollars towards your
down payment. Is that right?


 Ten-Booms: Right, according to the figures.


 Defense: And do you know what your down payment was supposed to be?


 Ten-Booms: 10 thousand dollars.


 Regarding Ten-Booms's failure to pay the purchase price of the Evergreen property,
Obregon cited to two of Ten-Booms's responses to Obregon's requests for admissions:

 No. 5: You have never tendered $83,101.31 to Ms. Obregon.


 Response: Admitted


 No. 36: You have never paid or tendered the purchase price of $83,101.31 for
the Evergreen Property.


 Response: Admitted



 The evidence cited by Obregon shows that Ten-Booms, by his own admission, failed
to pay both of the two parts of consideration set forth in the Agreement. Because the evidence
establishes that Ten-Booms failed to perform his obligations under the Agreement, resulting in
Obregon's failure to receive the consideration set forth in the Agreement, we conclude that the trial
court did not err in determining that Obregon conclusively proved her affirmative defense of failure
of consideration. See The Colony, 272 S.W.3d at 733; U.S. Bank, 170 S.W.3d at 279. Thus,
the burden shifted to Ten-Booms to present evidence raising an issue of material fact. See
Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996); Neely v. Wilson, 331 S.W.3d 900, 912 (Tex.
App.--Austin 2011, pet. filed) (once defendant conclusively establishes each element of affirmative
defense, burden shifts to plaintiff to produce evidence creating fact issue in order to defeat summary
judgment). 

 In Ten-Booms's response to Obregon's conclusive proof of failure of consideration,
he argued the following: 


 [T]he accounting information that was identified in discovery is confusing and
incomplete since [Ten-Booms] made several payments to [Obregon] in cash and
[Obregon] evidently did not keep any reliable business records on the series of
transactions. Further, it is uncontroverted in [Obregon's] motion that [Obregon] has
documented that [Ten-Booms] paid $9,875.00 of the $10,000.00 down payment and
thus has substantially performed his contracted down payment obligation. It would
be improper for the Court to find failure of consideration in the face of substantial
performance by [Ten-Booms] of his down payment obligation. 


 Regarding Ten-Booms's first argument--that he made several cash payments to
Obregon that she did not account for--he did not provide the amounts of the alleged cash payments,
nor did he provide any evidence showing that he made the alleged payments. Regarding his second
argument--that he substantially performed the down-payment obligation--he did not cite to any
legal authority supporting the proposition that payment of most of a down payment constitutes
substantial performance of an agreement that also includes a sizable purchase price. 

 The substantial performance doctrine originated and is still mostly used in the context
of construction contracts. See Vance v. My Apartment Steak House, Inc., 677 S.W.2d 480, 482 (Tex.
1984); Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 164 (Tex. 1982); RAJ
Partners, Ltd. v. Darco Constr. Corp., 217 S.W.3d 638, 643 (Tex. App.--Amarillo 2006, no pet.);
Beard Family P'ship v. Commercial Indem. Ins. Co., 116 S.W.3d 839, 844 (Tex. App.--Austin
2003, no pet.). But the doctrine has also been expanded to other types of contracts. See, e.g., E.P.
Towne Ctr. Partners, L.P. v. Chopsticks, Inc., 242 S.W.3d 117, 124-25 (Tex. App.--El Paso 2007,
no pet.) (applied to settlement agreement); Geotech Energy Corp. v. Gulf States Telecomms. & Info.
Sys. Inc., 788 S.W.2d 386, 390 (Tex. App.--Houston [14th Dist.] 1990, no writ) (applied to contract
for sale and installation of telephone system); Continental Dredging, Inc. v. De-Kaizered, Inc.,
120 S.W.3d 380, 394 (Tex. App.--Texarkana 2003, pet. denied) (applied to contract for
dredging services).

 Substantial performance is defined as "performance of the primary, necessary terms
of an agreement." Black's Law Dictionary 1252 (9th ed. 2009). The doctrine of substantial
performance is not available to a party when that party has made a willful departure from the terms
of an agreement or omitted essential points of a project. See E.P. Towne, 242 S.W.3d at 125; Smith
v. Smith, 112 S.W.3d 275, 279 (Tex. App.--Corpus Christi 2003, pet. denied). 

 The down payment and purchase price of property set forth in an agreement are
considered essential terms of that agreement. See Liberto v. D.F. Stauffer Biscuit Co., 441 F.3d 318,
324 (5th Cir. 2006) (noting that Texas courts generally construe essential terms of contract to include
price to be paid). Ten-Booms's admitted failure to pay the balance of the purchase price and the full
down payment--essential elements of the Agreement--precluded him from recovering under the
substantial-performance doctrine. See id.; Smith, 112 S.W.3d at 279. Given that Ten-Booms also
did not provide any evidence that he made additional cash payments to Obregon as he alleged, we
conclude that the trial court did not err in determining that Ten-Booms failed to raise an issue of
material fact as to Obregon's affirmative defense of failure of consideration. 

 If an appellant fails to challenge each ground for summary judgment advanced in the
trial court, as Ten-Booms did here, we must affirm the summary judgment on the basis of the
unchallenged grounds. See Malooly Bros., Inc. v. Napier, 461 S.W.2d 119, 121 (Tex. 1970);
Long v. Long, 196 S.W.3d 460, 468-69 (Tex. App.--Dallas 2006, no pet.); Bailey v. Rogers,
631 S.W.2d 784, 786 (Tex. App.--Austin 1982, no writ). Because we conclude that the trial court
did not err in determining that Obregon was entitled to summary judgment based on the affirmative
defense of failure of consideration, which Ten-Booms does not challenge on appeal, we affirm the
trial court's order granting summary judgment in favor of Obregon. 


Final Judgment 

 In two issues, Ten-Booms challenges the trial court's final judgment, contending
that the trial court erred in (1) ordering him to pay back rent, and (2) ordering him to pay Obregon's
attorney's fees. We discuss each issue below. 


 A. Back Rent

 Ten-Booms argues that the trial court erred in ordering him to pay $1,484.17 in
rent for the dates of February 15 through March 31, 2009. The issue arose in the trial court when
Obregon filed a counterclaim against Ten-Booms for breach of lease and sought unpaid rent for
the last six weeks of Ten-Booms's lease. The record shows that on February 10, 2009, Obregon
sent Ten-Booms a notice of her intent not to renew his lease past March 31, 2009. When Ten-Booms failed to pay his February rent, Obregon sent him a February 18, 2009 notice of default
and termination of his lease, in which she stated that she would allow him to have access to the
property until February 28, 2009. At the end of February, Obregon went to the house on the
Evergreen property and discovered that Ten-Booms had moved out. When Ten-Booms later filed
suit, Obregon filed a counterclaim for the unpaid rent, and after granting summary judgment in
favor of Obregon, the trial court ordered Ten-Booms to pay the rent. 

 Ten-Booms contends on appeal that the trial court erred in ordering him to pay the
six weeks' worth of rent because Obregon breached the Agreement, thus excusing his performance
under the Agreement, or because Obregon made his performance impossible by converting the
Evergreen property into a condominium. However, regarding the first part of his argument, Ten-Booms does not explain how Obregon breached the Agreement or cite to any authority in support
of the argument. He provides nothing more than the mere allegation that Obregon breached the
Agreement. Without citations to authority or to the record, and without any other information
explaining the argument, we cannot address it. See Tex. R. App. P. 38.1(i) ("The brief must
contain a clear and concise argument for the contentions made, with appropriate citations to
authorities and to the record.") 

 Regarding Ten-Booms's argument of impossibility, the argument is in reference
only to the Agreement as a sales contract, not as a lease. Ten-Booms argues only that Obregon
converted the Lot into condominiums, making it impossible for him to purchase the Evergreen
property in the form in which he wanted it. Thus, Ten-Booms does not provide any arguments
regarding the validity of the Agreement as a lease, which is the relevant question in determining
whether he owed back rent. In our review of the issue, we conclude that the trial court did not
err in determining that the Agreement satisfied the requirements of a lease. 

 A "lease" for real property is an agreement by which a person owning property
grants to another the right to use and occupy the property for a specified period of time in
exchange for a periodic payment of a stipulated price, which is usually referred to as rent. 
Franklin v. Jackson, 847 S.W.2d 306, 308 (Tex. App.--El Paso 1992, writ denied); Black's Law
Dictionary 970 (9th ed. 2009). Here, the Agreement required periodic payments in the form of
monthly payments from Ten-Booms to Obregon in the amount of $989.44. The term of the
Agreement was thirty-six months. In the Agreement, the parties referred to Obregon as the
"Lessor" and Ten-Booms as the "Lessee." Thus, the Agreement met all the elements of a lease. 
See Franklin, 847 S.W.2d at 308; Black's Law Dictionary 970 (9th ed. 2009). 

 Considerable evidence also demonstrates that the parties treated the Agreement as
a lease. For example, the record shows that Ten-Booms made payments to Obregon in the
amount of $989.44 each month and that he occupied the house on the Evergreen property until
he received notice that Obregon intended not to renew the lease. Ten-Booms also made the
following admissions in his response to Obregon's requests for admissions:


 No. 12: You were a tenant at the Evergreen Property.

 

 Response: Admitted.


 No. 13: You paid rent at the Evergreen Property.


 Response: Admitted. 



Further, in the mediated settlement agreement in this case, Ten-Booms agreed to abate the dispute
for a certain period of time and, during the abatement period, to "continue to pay monthly rent
. . . by the 15th of each month." Finally, the record indicates that when Obregon sent Ten-Booms a notice terminating the lease and asking him to vacate the Evergreen property, he did so. 
Based on the evidence in the record, we conclude that the trial court did not err in deeming the
Agreement a valid lease. (3) 

 The original term of the Agreement expired on June 1, 2008, yet Ten-Booms
remained in possession of the Evergreen property and continued to pay rent until February 2009. 
A tenant who continues to occupy the premises after expiration of a lease is a holdover tenant. 
Gym-N-I Playgrounds, Inc. v. Snider, 220 S.W.3d 905, 908 (Tex. 2007). We look at the lease
itself to determine whether the terms of the lease continue in the event of a holdover tenancy. 
Bockelmann v. Marynick, 788 S.W.2d 569, 571-72 (Tex. 1990). A holdover tenant is presumed
to be bound by covenants that were binding on him during the term of the lease. Barragan v.
Munoz, 525 S.W.2d 559, 561 (Tex. Civ. App.--El Paso 1975, no writ). Even when the lease
does not contain a holdover provision, if the tenant remains in possession and rent continues to
be accepted by the landlord, the terms of the expired lease are presumed to continue unless there
is an agreement to the contrary. Id. at 562; see also Carrasco v. Stewart, 224 S.W.3d 363, 368
(Tex. App.--El Paso 2006, no pet.). 

 When no new lease is formed and a tenant continues in possession of land covered
by a prior lease, that tenant is either a tenant at will or a tenant at sufferance. See Bockelmann,
788 S.W.2d at 571; ICM Mortgage Corp. v. Jacob, 902 S.W.2d 527, 530 (Tex. App.--El Paso
1994, writ denied). A tenant at will is one who is in lawful possession of premises by permission
of the owner or landlord and for no fixed duration. See Fandey v. Lee, 880 S.W.2d 164, 169
(Tex. App.--El Paso 1994, writ denied); Virani v. Syal, 836 S.W.2d 749, 751-52 (Tex.
App.--Houston [1st Dist.] 1992, writ denied); Black's Law Dictionary 1604 (9th ed. 2009). A
tenant at sufferance is a person who has been in lawful possession of property but who wrongfully
remains as a holdover after his right to possession has expired. See ICM Mortgage, 902 S.W.2d
at 530; Black's Law Dictionary 1604 (9th ed. 2009). "A tenant at will, in contrast to a tenant at
sufferance, possesses the property with the owner's consent." ICM Mortgage, 902 S.W.2d at
530.

 Here, there is no dispute that Ten-Booms continued to occupy the house on the
Evergreen property after the lease expired in June 2008, making him a holdover tenant. See Gym-N-I Playgrounds, 220 S.W.3d at 908. The Agreement does not contain a holdover provision, and
there is no evidence in the record suggesting that the parties made a new lease agreement after the
lease expired. Thus, the terms of the expired lease are presumed to have continued. See
Barragan, 525 S.W.2d at 561. 

 There is also no dispute that Ten-Booms was occupying the property with the
permission of Obregon, which made him a tenant at will rather than a tenant at sufferance. ICM
Mortgage, 902 S.W.2d at 530; Virani, 836 S.W.2d at 751-52. A tenancy at will is terminable
at the will of either party upon fair notice. See ICM Mortgage, 902 S.W.2d at 530; Black's Law
Dictionary 1604 (9th ed. 2009). Obregon provided notice of her intent not to renew the lease in
a letter dated February 10, 2009. At that point, she stated her intent to terminate the lease as of
March 31, 2009. (4) After receiving the notice, Ten-Booms did not pay rent for the remaining term
of the lease, from February 15, 2009, through March 31, 2009. 

 Given the circumstances in this case--that Ten-Booms's tenancy became a holdover
tenancy when he occupied the Evergreen property after the Agreement expired, that the terms of
the expired lease were presumed to continue, that Ten-Booms became a tenant at will after the
Agreement expired, that his lease as a tenant at will ended on March 31, 2009, and that Obregon
provided fair notice of her intent not to renew the lease--we conclude that the trial court did not
err in ordering Ten-Booms to pay back rent from February 15, 2009, to the end of the lease term
on March 31, 2009. (5) See Gym-N-I Playgrounds, 220 S.W.3d at 908; ICM Mortgage, 902 S.W.2d
at 530; Fandey, 880 S.W.2d at 169-70; Barragan, 525 S.W.2d at 561. 


 B. Attorney's Fees 

 In his final issue, Ten-Booms asserts that the trial court erred in: (1) awarding
attorney's fees to Obregon when there was no legal basis for doing so; and (2) awarding the
amount of attorney's fees that it did, $69,578.81, when Obregon did not sufficiently establish that
she had incurred that amount or that the amount was reasonable. We address each of the
arguments below.

 i. Legal Basis

 Attorney's fees cannot be recovered absent a statute or contract allowing for their
recovery. See MBM Fin. Corp. v. The Woodlands Operating Co., 292 S.W.3d 660, 669 (Tex.
2009). Whether a party is entitled to recover attorney's fees is a question of law, which we
review de novo. See Holland v. Wal-Mart Stores, Inc., 1 S.W.3d 91, 95 (Tex. 1999). Ten-Booms contends that the trial court did not have a legal basis for awarding attorney's fees because
the final judgment did not include a declaratory judgment or any other ruling that would authorize
such fees. Obregon counters that the attorney's fees were authorized by the trial court's
previously issued summary-judgment order, which granted summary judgment on her declaratory-judgment counterclaim. 

 According to the Texas Uniform Declaratory Judgments Act, a court may award
reasonable and necessary attorney's fees in any declaratory-judgment proceeding as long as the
fees are equitable and just. Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008). A party
who is awarded a declaratory judgment at a summary-judgment proceeding is entitled to attorney's
fees. See Rolling Lands Invs., L.C. v. Northwest Airport Mgmt., L.P., 111 S.W.3d 187, 201
(Tex. App.--Texarkana 2003, pet. denied); Texas River Barges v. City of San Antonio, 21 S.W.3d
347, 358 (Tex. App.--San Antonio 2000, pet. denied). 

 Here, Obregon sought summary judgment on all of Ten-Booms's claims and all of
her counterclaims, including her counterclaim for declaratory judgment. In that counterclaim, she
sought a declaration that Ten-Booms had no enforceable interest in the Evergreen property. The
trial court granted Obregon's summary-judgment motion. (6) Thus, contrary to Ten-Booms's
assertion, the trial court did in fact issue a declaratory judgment. Accordingly, the trial court was
authorized to award attorney's fees. See Tex. Civ. Prac. & Rem. Code Ann. § 37.009; Rolling
Lands, 111 S.W.3d at 201; Texas River Barges, 21 S.W.3d at 358. 


 ii. Amount of Attorney's Fees

 Ten-Booms contends that the trial court erred in awarding Obregon $69,578.81 in
attorney's fees because Obregon did not sufficiently establish that she had incurred that amount
of fees or that the amount was reasonable. (7) The amount of attorney's fees awarded under the
Declaratory Judgments Act rests within the sound discretion of the trial court, subject to the
requirements that any fees awarded be reasonable and necessary, which are matters of fact, and
to the additional requirements that the fees be equitable and just, which are matters of law. 
Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998). It is an abuse of discretion for a trial court
to rule arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting
evidence. Id. 

 In reviewing the reasonableness of an award of attorney's fees, a reviewing court
should consider: (1) the time and labor required, the novelty and difficulty of the questions
involved, and the skill required to perform the legal service properly; (2) the likelihood that the
acceptance of the particular employment will preclude other employment by the lawyer; (3) the
fee customarily charged in the locality for similar legal services; (4) the amount involved and the
results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the
nature and length of the professional relationship with the client; (7) the experience, reputation,
and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or
contingent on results obtained or uncertainty of collection before the legal services have been
rendered. Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997). 
A trial court is not required to consider all of the factors in every case because the factors are
merely guidelines, not elements of proof. Petco Animal Supplies, Inc. v. Schuster, 144 S.W.3d
554, 567 (Tex. App.--Austin 2004, no pet.). 

 Here, Obregon included a request for attorney's fees in her declaratory-judgment
counterclaim and in her motion for summary judgment. In her summary-judgment motion, she
asked for leave of court to supplement the record with proof of attorney's fees. After the trial
court granted Obregon's summary-judgment motion, Obregon filed a supplement to the record
that included an affidavit from her attorney attesting to the reasonableness of the fees charged and
a final invoice showing the total amount of attorney's fees incurred as $69,578.81. The trial court
then held a hearing regarding the attorney's-fees issue, during which Ten-Booms's attorney cross-examined Obregon's attorney, Kim Lowe, regarding the fee amount. Ten-Booms did not present
any opposing evidence. After the hearing, the trial court awarded the attorney's fees requested
by Obregon. 

 The affidavit filed by Lowe addressed several of the factors set forth in Arthur
Andersen. For example, Lowe described the nature of the case and the professional relationship
with Obregon; explained the difficulty in defending against a multitude of claims brought by Ten-Booms, including the necessity of preparing a fifty-page summary judgment motion with six-hundred pages of supplemental documentary evidence; set forth Lowe's and her partner's
experience and abilities; stated that the fee Lowe and her partner charged Obregon for their
representation was two-hundred dollars per hour, which she stated was well within the range of
usual and customary fees in the region; and attached an invoice that generally described the labor
required in representing Obregon and showed that Lowe and her partner spent a total of 347 hours
on the case, totaling $69,578.81 in attorney's fees. 

 At the hearing on the attorney's-fees issue, Lowe further explained the attorney's
fees incurred by Obregon. Lowe testified that she and her partner had to spend a great deal of
time on the case because Ten-Booms raised many causes of action, amended his petition several
times, and sought several remedies. Lowe further testified that her representation of Obregon
precluded her from representing several other potential clients, whom she had to refer to other
attorneys because she was busy representing Obregon. Ten-Booms's attorney cross-examined
Lowe regarding her bookkeeping, pointing out that the invoice attached to her affidavit did not
itemize work on a daily or weekly basis. Rather, the invoice provided general descriptions, such
as "Legal Services: Research, Preparation, and Drafting Motion for Summary Judgment," and
set forth the total number of hours taken for the task. In response to Ten-Booms's attorney's
cross-examination, Lowe explained that she worked in a small office and that she kept track of
time using sticky notes. She testified that after recording her time on the sticky notes, she then
entered the information into her computer. She further explained that she had changed to a new
time-recording system while she was working on Obregon's case, and many of the hours she spent
on the case occurred before she began using the new system. 

 For purposes of summary judgment, an attorney's affidavit alone can sufficiently
establish the reasonableness of attorney's fees if the affidavit is uncontroverted. See In re Estate
of Tyner, 292 S.W.3d 179, 184 (Tex. App.--Tyler 2009, no pet.); In re Estate of Friesenhahn,
185 S.W.3d 16, 21 (Tex. App.--San Antonio 2005, pet. denied). Here, the record includes
Lowe's affidavit as well as her testimony at a hearing on attorney's fees, neither of which was
controverted by Ten-Booms. Although Ten-Booms's attorney cross-examined Lowe and argued
during his closing argument that the attorney's fees were unreasonable, he did not present an
affidavit or any other evidence that contested Lowe's affidavit or testimony. An opposing
attorney's criticism of the amount of attorney's fees sought does not raise a fact issue regarding
the reasonableness of the attorney's fees. See Karen Corp. v. Burlington N. & Santa Fe Ry. Co.,
107 S.W.3d 118, 126 (Tex. App.--Fort Worth 2003, pet. denied) (affidavit establishing
reasonableness of attorney's fees must be controverted with facts demonstrating that fees were
unreasonable); Owen Elec. Supply, Inc. v. Brite Day Constr. Inc., 821 S.W.2d 283, 288 (Tex.
App.--Houston [1st Dist.] 1991, writ denied) ("To create a fact issue, the non-movant's attorney
must file an affidavit contesting the reasonableness of the movant's attorney's fee affidavit."). 
 

 Given the evidence presented by Obregon showing the reasonableness of the
attorney's fees she incurred in this lawsuit, and considering the absence of opposing evidence
presented by Ten-Booms, we conclude that the trial court did not abuse its discretion in
awarding $69,578.81 in attorney's fees to Obregon. (8) See Tyner, 292 S.W.3d at 184;
Friesenhahn, 185 S.W.3d at 21. 


 C. Conclusion Regarding Final Judgment

 Because we have concluded that the trial court did not err in awarding back rent
and attorney's fees to Obregon, we affirm the trial court's final judgment.


CONCLUSION

 Based on the foregoing, we affirm the trial court's order granting summary
judgment in favor of Obregon, and we affirm the trial court's final judgment awarding Obregon
unpaid rent in the amount of $1,484.17 and attorney's fees in the amount of $69,578.81. 



 __________________________________________

 David Puryear, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed

Filed: June 3, 2011
1. A defendant may move for summary judgment on an affirmative defense, and when a
defendant raises more than one affirmative defense in a motion for summary judgment, as Obregon
did here, she need only conclusively establish one affirmative defense to be entitled to summary
judgment. See Havlen v. McDougall, 22 S.W.3d 343, 345 (Tex. 2000); Swilley v. Hughes,
488 S.W.2d 64, 67 (Tex. 1972); Poncar v. Mission, 797 S.W.2d 236, 239 (Tex. App.--Corpus
Christi 1990, no writ). 
2. It is a general rule in Texas that a party must show that he has complied with his
obligations under the contract to be entitled to specific performance. DiGiuseppe v. Lawler,
269 S.W.3d 588, 594 (Tex. 2008). Thus, a plaintiff seeking specific performance, as a general rule,
must actually tender performance as a prerequisite to obtaining specific performance. Id. 
3. In an alternative argument, Ten-Booms contends that the Agreement was unenforceable
as a sales contract under the statute of frauds based on an invalid legal description of the Evergreen
property and that the Agreement therefore automatically became unenforceable as a lease. However,
while a contract for the sale of real property becomes invalid under the statute of frauds if there
is an invalid legal description of the property, see Jones v. Kelley, 614 S.W.2d 95, 99 (Tex.
1981); Republic Nat'l Bank of Dallas v. Stetson, 390 S.W.2d 257, 261 (Tex. 1965); Nguyen v.
Yovan, 317 S.W.3d 261, 267 (Tex. App.--Houston [1st Dist.] 2009, pet. filed), a contract for the
lease of the property does not necessarily become invalid under the same circumstances. Rather,
when a contract for the lease of property is ambiguous, extraneous evidence is admissible to
determine the meaning of the contract. See Towers of Tex., Inc. v. J & J Sys., Inc., 834 S.W.2d
1, 2 (Tex. 1992) (trial court did not err in deeming property description in lease ambiguous and
considering further evidence to resolve the issue); United Interests, Inc. v. Brewington, Inc., 729
S.W.2d 897, 903 (Tex. App.--Houston [14th Dist.] 1987, writ ref'd n.r.e.) (trial court did not
err in determining that certain paragraphs in sublease were ambiguous and then admitting parole
evidence to determine parties' intent). The record does not contain any instances of Ten-Booms
raising the issue in the trial court or of either party presenting relevant extraneous evidence. 
Accordingly, we reject Ten-Booms's argument.
4. Ten-Booms has not raised any issues related to Obregon's termination of the lease. 
5. The trial court's back-rent award of $1,484.17 for a month-and-a-half of tenancy was
consistent with the payment terms of the lease, which required Ten-Booms to pay $989.44 per
month. 
6. Ten-Booms appealed from both the summary-judgment order and the final judgment,
which the trial court stated was issued "[i]n accordance with th[e] summary judgment." 
7. Although Ten-Booms challenged the amount of the attorney's fees award in two separate
issues in his brief, we combine the two into one based on the relevant case law. We also note that
Ten-Booms did not cite to any legal authority in support of his challenge to the sufficiency of the
evidence establishing the amount of attorney's fees. 
8. Ten-Booms also argues that the attorney's fees awarded in this case were unconscionable
and cites to rule 1.04(a) of the disciplinary rules of professional conduct, which states that "[a]
lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable
fee." Tex. Disciplinary R. Prof'l Conduct 1.04(a). Because we have concluded that the trial court
did not abuse its discretion in determining that Obregon's attorney's fees were reasonable, we
necessarily conclude that the fees were not unconscionable.